## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHARLES MORGAN, : 
: 4:17-cr-01142
:
: Hon. John E. Jones III
v. :
:
:
MICHAEL FIORENTINO, JR., :
*et al.,* :
:
Defendants. :

## MEMORANDUM

### June 27, 2019

Presently pending before the Court are cross-motions for summary judgment. (Docs. 34, 38). Both motions have been fully briefed, (Docs. 36, 41, 48, 50, 55, 56), and are ripe for disposition. For the reasons, Defendants' motion shall be granted and Plaintiff's motion shall be denied.

## I. BACKGROUND

Plaintiff Charles Morgan ("Plaintiff" or "Morgan") has been a professor at Lock Haven University of Pennsylvania ("LHU") since 2004. He has had tenure since 2009 and served as chair of the mathematics department from 2011 to 2016. In 1989, more than fifteen years prior to being hired by LHU, Morgan was convicted in Kentucky of two counts sodomy and one count sexual abuse. "Though the exact nature of [Morgan's] crime is unclear, it appears that [Morgan], who was

19 years old at the time, performed oral sex on an 8-year-old boy and engaged in another unspecified sexual act with another minor." *Pennsylvania State Sys. of Higher Educ., Lock Haven Univ. v. Ass'n of Pennsylvania State Coll. & Univ. Faculties*, 193 A.3d 486, 491 (Pa. Commw. Ct. 2018) (hereinafter "*PASSHE*"). Morgan was sentenced to five years' imprisonment but served less than four years after completing a voluntary sex offender therapy program. In 2004, approximately 15 years after his conviction, Morgan applied for employment at LHU and truthfully told LHU that he had not been convicted of a criminal offense in the last ten years. LHU did not inquire any further concerning Morgan's criminal history at that time.

In 2016, the Pennsylvania General Assembly enacted various changes to Pennsylvania's Child Protective Services Law ("CPSL"), 23 Pa.C.S. § 6301 *et seq.* These changes mandated that an employer subject to the CPSL shall not hire an applicant that has been identified as a child abuse "perpetrator" or an applicant that has been convicted of any of the offenses enumerated in the statute. These enumerated crimes include, *inter alia*, sexual assault, endangering the welfare of children, sexual abuse of children, and corruption of minors. These changes to the CPSL, however, did not apply "to an employee of an institution of higher education whose direct contact with children, in the course of employment, is

limited to" prospective, visiting students and/or underage matriculated students. 23 Pa.C.S. § 6344.

On February 20, 2015, LHU adopted the University Protection of Minors Policy Handbook ("Minors Policy"), (Doc. 42-8), pursuant to instructions issued by the Pennsylvania State System of Higher Education Board of Governors ("PASSHE") to "develop a criminal background investigation policy and ensure its consistent application . . . [in compliance] with federal and state laws or regulations regarding criminal background investigations and the use of such investigations in employment situations," (Doc. 42-7), and PASSHE's mandate that "[e]ach State System entity offering or approving programs that involve minors within the scope of this document will establish and implement policies and procedures consistent with this policy." (Doc. 42-10 at ¶ C). LHU's Minors Policy stated that "[t]he University will notify employees by separate communication concerning the details and timeline for obtaining the required background clearances pursuant to both the Board of Governors policy and the law." (Doc. 42-8 at 7).

Because the CPSL seemed to apply only to prospective employees, the Association of Pennsylvania State College and University Faculties ("APSCUF" or "the Union") challenged PASSHE's background and reporting requirements in the Pennsylvania Commonwealth Court as it applied to current employees. *PASSHE*,

193 A.3d at 490–91. The Commonwealth Court entered a preliminary injunction preventing PASSHE from requiring APSCUF members, like Morgan, to submit clearances "except with respect to PASSHE employees who teach courses containing dual enrollees or who are involved with programs that require the employees to have direct contact with children." *Id.* Specifically, the Commonwealth Court noted, "all PASSHE employees teaching an introductory level course, often referred to as a '100-level course,' must submit Section 6344 clearances." *Id.* On April 26, 2017, the Supreme Court affirmed the Commonwealth Court's order. *PASSHE*, 161 A.3d 193 (Pa. 2017).

Shortly after the Commonwealth Court's January 13, 2016 order, Morgan and other LHU employees who were scheduled to teach 100-level courses or who were involved in programs which required them to come in direct contact with minors were asked to complete a background check. (Doc. 42-12). Morgan complied, and his background check revealed his 1989 crimes.

On April 6, 2016, LHU's President Michael Fiorentino, Jr. ("Fiorentino"), wrote to Morgan informing him that LHU intended to conduct a fact-finding investigation "in response to information that has come to our attention as a result of criminal background clearance completed in accordance with PASSHE" policies. (Doc. 42-13). Specifically, Fiorentino noted, "[a]dditional information was requested so that the University had a better understanding of the

circumstances surrounding your situation prior to taking any action." (*Id.*).

Fiorentino attached copies of the records received as part of the background check and notified Morgan of the time, date, and location of the fact-finding meeting scheduled to take place. The letter also notified Morgan that he was being placed on administrative leave with pay pending the results of that investigation. (*Id.*).

On April 15, 2016, Associate Vice President of Human Resources Deana Hill ("Hill") held a fact-finding meeting attended by Morgan and Sara Miller, Morgan's representative from APSCUF. (Doc. 42-14). At the meeting, Morgan explained that he had not had any criminal issues since his release from prison, that he had consistently obeyed LHU's policies, that he was "a safe member of the faculty," and that, in order to avoid ever being "under suspicion," he always kept his office door open. (*Id.*).

On May 9, 2016, Fiorentino held a pre-disciplinary conference that was attended by Hill, Morgan, and Miller. (Doc. 42-9). At that conference, Morgan reiterated his view that "twenty-seven years have passed" since his conviction and that he is "not the same person as I was then." (*Id.*).

On May 18, 2016, Fiorentino sent Morgan a letter formally terminating his employment at LHU. (Doc. 42-4). In the letter, Fiorentino stated that Morgan was being terminated "because of [his] criminal conviction of a reportable offense[(s)] as defined by" the CPSL. (*Id.*). Fiorentino noted that:

> Your duties at Lock Haven University include a regular and recurring teaching assignment that requires you provide instruction in 100 level math courses in which non-matriculated minors may enroll and you are involved in an academic program for high school students hosted annually by your department . . . . Therefore, given the grave nature of your convictions and, after weighing the severity, relevancy, and recency of those convictions, I conclude that the severity and relevancy, together or independently, outweigh any possible mitigation based upon the passage of time.

(*Id.*). Moreover, Fiorentino made clear that he did "not agree with [Morgan's] assessment" that he was not "the same person [that he was] at the time of the conviction" and that the "strong policy statement from the General Assembly" in amending the CPSL which "would have served to disqualify [him] from employment at [LHU had he been] currently seeking employment" supported his decision. (*Id.*). As such, Fiorentino concluded, LHU had "no alternative but to terminate [Morgan's] employment effective immediately." (*Id.*).

With the support of the Union, Morgan challenged his termination pursuant to his collective bargaining agreement before an arbitrator. The arbitrator found Morgan's termination to be without just cause and ordered his reinstatement. Specifically, the arbitrator found that Morgan's unblemished record since his release from prison and the fact that LHU could easily schedule Morgan to teach courses that did not expose him to underage students suggested that Morgan's "missteps of his teenage years have not followed him into middle age" and that there was only an arbitrary relationship between Morgan's past crimes and his

present fitness to perform his position.  (Doc. 42-20).  The Pennsylvania

Commonwealth Court affirmed the arbitrator's decision, *PASSHE*, 193 A.3d at

503, and the Pennsylvania Supreme Court denied *allocatur*.  *PASSHE*, 203 A.3d

980 (Pa. 2019).

In December 2016, Morgan filed a complaint with the Equal Employment

Opportunity Commission ("EEOC") and the Pennsylvania Human Relations

Commission ("PHRC") raising claims of sex discrimination and hostile work

environment against LHU.  On April 3, 2017, the EEOC issued Morgan a right to

sue letter.

Morgan filed the instant action on June 28, 2017, alleging constitutional

violations and gender discrimination under Titles VII and IX.  (Doc. 1).  On April

10, 2018, Morgan filed an amended complaint.  (Doc. 22).  In Counts I, II, II, IV,

and V of the amended complaint, Morgan contends that Fiorentino and Hill, acting

in their official capacities as LHU administrators and acting under the color of state

law, deprived him of his substantive and procedural due process rights, violated the

Ex Post Facto Clause, the Equal Protection Clause, and that his termination

amounted to cruel and unusual punishment.  Accordingly, Morgan seeks damages

and other remedied under 42 U.S.C. § 1983.  In Count VI, VII, VIII, IX, Morgan

asserts that PASSHE and LHU discriminated against him and subjected him to a

hostile work environment in violation of Titles VII and IX.  In Counts X and XI,

Morgan avers that Fiorentino and Hill discriminated against him and subjected him to a hostile work environment in violation of the Pennsylvania Human Relations Act ("PHRA"). Discovery in this case completed on January 28, 2019.

On March 22, 2019, Morgan filed the instant motion for partial summary judgment, (Doc. 34), and a brief in support thereof. (Doc. 36). The same day, Defendants Fiorentino, Hill, PASSHE, and LHU (collectively, "Defendants"), filed their own motion for summary judgment, (Doc. 38), and a brief in support thereof. (Doc. 41). Defendants and Morgan both filed briefs in opposition to opposing parties' motions on April 19, 2019, (Docs. 48, 50), and reply briefs on May 3, 2019. (Docs. 55, 56). On May 13, 2019, after seeking leave of Court, Morgan filed a Sur-Reply. (Doc. 61). Both motions for summary judgment have thus been fully briefed and are ripe for disposition. For the reasons that follow, Defendants' motion shall be granted and Morgan's motion shall be denied.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a fact is "material" only if it might affect the outcome of the action under the governing law. *See Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162,

172 (3d Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A court should view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences therefrom, and should not evaluate credibility or weigh the evidence.  *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

Initially, the moving party bears the burden of demonstrating the absence of a genuine dispute of material fact, and upon satisfaction of that burden, the non-movant must go beyond the pleadings, pointing to particular facts that evidence a genuine dispute for trial.  *See id.* at 773 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  In advancing their positions, the parties must support their factual assertions by citing to specific parts of the record or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. Civ. P. 56(c)(1).  A plaintiff that fails to dispute a genuine issue of material fact as to any of the elements of his or her *prima facie* case has not met his or her initial burden and summary judgment is properly granted for the defendant. *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).

A court should not grant summary judgment when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them.

*See Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010) (citing *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982)). Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 211 (3d Cir. 2011) (quoting *Anderson*, 477 U.S. at 247-48) (internal quotation marks omitted).

## III.  DISCUSSION

Both Morgan and Defendants contend that they are entitled to summary judgment as to all counts in the amended complaint. Accordingly, we address each count *seriatim*, starting with Defendants' motion.

### a.  Counts I, II, III, IV, V – Qualified Immunity

In their motion and accompanying briefs, Defendants argue that Fiorentino and Hill are shielded from Morgan's § 1983 claims by qualified immunity and that they are entitled to summary judgment as to Counts I–V. According to Defendants, "[t]he doctrine of qualified immunity shields 'government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (Doc. 41 at 4 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Bergdoll v. City of York*, 515 F.App'x 165, 169 n.2 (3d Cir. 2013)). Indeed, Defendants posit, "[p]ublic officials are entitled to

qualified immunity unless the rights they are allegedly violating are sufficiently clear that a reasonable official would understand that his actions were violating that right." (*Id*. at 5 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  In this case, Defendants reason, Fiorentino and Hill are shielded by qualified immunity because it was not sufficiently clear that they understood that their actions were violating Morgan's constitutional rights considering that employees in Pennsylvania can generally be terminated at any time, for any reason.  (*Id*. at 6 (citing *Weaver v. Harpster*, 975 A.2d 555, 559 (Pa. 2009)).  According to Defendants, "[t]here was no clearly established law holding that Dr. Morgan could not be terminated given the circumstances at the time," and Fiorentino and Hill could thus not be said to have violated a "clearly established" constitutional right by terminating him.  (*Id*.).

In response, Morgan argues that a genuine issue of material fact remains as to whether Fiorentino's and Hill's actions violated his "clearly established" substantive and procedural due rights and that summary judgment is thus inappropriate.  According to Morgan, for decades, Pennsylvania courts have held that "statutory employment terminations predicated upon prior convictions like the CPSL violate substantive due process."  (Doc. 48 at 5 (citing *Sec'y of Revenue v. John's Vending Corp*., 309 A.2d 358, 361 (Pa. 1973) (holding that being convicted of a crime of moral turpitude cannot serve as the basis for a state agency to revoke

a wholesale cigarette sales license because "the prior convictions do not in anyway reflect upon the [license holder's] present ability to properly discharge the responsibilities required by the position"); *Warren Cty. Human Servs. v. State Civil Serv. Comm'n (Roberts)*, 844 A.2d 70, 74 (Pa. Commw. Ct. 2004) (holding that, the CPSL is unconstitutional because it "creates limitations that have no temporal proximity to the time of hiring" and "does not bear a real and substantial relationship to the Commonwealth's interest in protecting children")). Likewise, Morgan asserts, Pennsylvania courts have reaffirmed an employee's right to pre-termination proceedings as outlined in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538–39 (1985). (Doc. 48 at 4 (citing *Ocasio v. Ciach*, No. 17-cv-755, 2019 WL 158280, at *7 (E.D. Pa. Jan. 10, 2019))). Accordingly, Morgan concludes, "[b]ecause factual disputes remain whether Defendants violated Morgan's [substantive and procedural due process] rights and those rights are 'clearly established,' Defendants are not entitled to qualified immunity."[1]  (*Id.*).

In their Reply, Defendants urge that, even if Morgan has shown that a specific constitutional right is established as a matter of law in the abstract, "he offers no specific or particular conduct on part of Fiorentino and Hill that would

---

[1]    Although Morgan asserts several constitutional claims in his complaint, in responding to Defendants' motion for summary judgment based upon qualified immunity, Morgan speaks only to his substantive and procedural due process rights outlined in Counts I and II. Thus, we address only whether Morgan's constitutional claims in Counts I and II are sufficient to overcome qualified immunity. Morgan has waived all other arguments as to qualified immunity. *See Kost v. Kozakiewicz,* 1 F.3d 176, 182 (3d Cir. 1993).

preclude the application of qualified immunity." (Doc. 56 at 7–8). Rather,

Defendants surmise, Morgan "makes blanket assertions that factual disputes

remain about his Due Process rights and that those rights are 'clearly established'"

which does not defeat the proper application of qualified immunity in this case.

(*Id*.). We agree.

As Defendants note, it is well-settled that "[t]he doctrine of qualified

immunity protects government officials 'from liability for civil damages insofar as

their conduct does not violate clearly established statutory or constitutional rights

of which a reasonable person would have known.'" *Bergdoll*, 515 Fed.App'x at

169 n.2 (quoting *Harlow*, 457 U.S. at 818).

> The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow*. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy "the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties," by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages." It should not be surprising, therefore, that our cases establish that the right the official is alleged to

have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson*, 483 U.S. at 639–40 (internal citations omitted).

The various constitutional rights Morgan asserts are certainly well-settled and "clearly established." However, because Morgan asserts these constitutional rights as a claim for money damages under § 1983 based upon an assertedly unlawful termination, this Court need not review only whether Morgan's rights were "clearly established," but also whether the contours of those rights were so "clearly established" by existing law that "a reasonable official" would have understood that he or she was violating those rights by terminating him. *See id*. at 640. As noted by *Anderson* and *Harlow*, in order to be actionable under § 1983, "the unlawfulness must be apparent." *Id*. "[I]f the law did not put the [defendant] on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Bayer v. Monroe County Children and Youth Serv*., 577 F.3d 186, 193 (3d Cir. 2009).

In support of his contention that the unlawfulness of his termination was apparent, Morgan points to two Pennsylvania cases which hold that a statute which imposes a lifetime ban upon previously convicted individuals is unconstitutional.

(Doc. 48 at 5 (citing *John's Vending Corp.*, 309 A.2d at 361; *Roberts*, 844 A.2d at 74)).  Morgan alleges that "[t]hese cases give 'fair warning' to Defendants that their termination of Morgan was unconstitutional."  (*Id.*).  Neither of these cases, however, suggest that an employer unreasonably violates a "clearly established" constitutional right when he or she terminates an employee based upon the employer's reasonable belief that the employee's criminal history renders that employee unfit for the position.  Instead, those cases render unconstitutional a statute like the CPSL which precludes an individual from holding certain positions simply because that individual has been convicted of specific crimes.  Therefore, to put it simply, the inferential leap required to conclude that those cases gave "fair warning" to Fiorentino and Hill that Morgan's termination was unlawful is specious at best.  In our view, a reasonable official in Fiorentino's and Hill's position would not have understood that terminating Morgan would have infringed his constitutional right and the unlawfulness of Morgan's termination was therefore not apparent.  *See Anderson*, 483 U.S. at 640.

To be clear, even assuming *arguendo* that Morgan is correct that the reflexive application of the CPSL violated his constitutional rights, Fiorentino and Hill did not terminate Morgan on that basis.  Rather, as outlined in his termination letter, Fiorentino and Hill terminated Morgan because they believed that his conviction rendered him unfit for his job because his job required him to interact

with minors. (*See* Doc. 42-4 ("Your duties at Lock Haven University include a regular and recurring teaching assignment that requires you provide instruction in 100 level math courses in which non-matriculated minors may enroll and you are involved in an academic program for high school students hosted annually by your department . . . . Therefore, given the grave nature of your convictions and, after weighing the severity, relevancy, and recency of those convictions, I conclude that the severity and relevancy, together or independently, outweigh any possible mitigation based upon the passage of time."). There is a distinct difference between terminating an employee simply because that employee has a conviction on his or her record and terminating an employee because the employer believes that the employee's conviction renders them unfit for the position. This is true, even if the employee insists—as Morgan does here—that he has been rehabilitated and that he is, in fact, fit for the position. Indeed, Morgan's termination letter tacitly acknowledged that the CPSL could not, in and of itself, serve as the sole basis for his termination. Instead, Fiorentino identified that "policy statement from the General Assembly" in enacting the statute suggested that Morgan's termination was appropriate. (Doc. 42-4). Had the reflexive application of the CPSL, by itself, served as the basis of Morgan's termination—as Morgan alleges—Fiorentino would have simply stated as much.

Moreover, it would strain logic to insist that Fiorentino's and Hill's consideration of Morgan's conviction was "clearly unlawful," *see Bayer*, 577 F.3d at 193, after the Commonwealth Court explicitly permitted them to request background checks from employees, like Morgan, that teach 100-level courses. *See PASSHE*, 193 A.3d at 491. That is, for what other purpose would Fiorentino and Hill have sought Morgan's background checks, other than deciding whether to retain him? Accordingly, it would be nonsensical for the Commonwealth Court to allow Fiorentino and Hill to request Morgan's background check and then for us to find that Fiorentino and Hill should have known that terminating Morgan as a result thereof violated his "clearly established" constitutional rights.

As a final matter, we reject Morgan's generalized contention that summary judgment is inappropriate because factual disputes remain as to whether Defendants violated his procedural due process rights. Although Morgan has demonstrated that the general principle of procedural due process is "clearly established," Morgan has not pointed to any particular reason why, "in the light of pre-existing law," the unlawfulness of his pre-termination process should have been "apparent" to Fiorentino and Hill. *See Anderson*, 483 U.S. at 639–40. Prior to his termination, Morgan participated in a fact-finding investigation and a pre-disciplinary conference. Morgan was present at both, was offered an opportunity to provide input, and was accompanied by a union representative. Morgan was

also issued several notices concerning the investigations and his termination. *See McDaniels v. Flick*, 59 F.3d 446, 456 (3d Cir. 1995) (holding that procedural due process requires that a tenured professor be provided only notice, an explanation of the charges, and an opportunity to respond prior to termination).

Although nestled in another portion of his brief, Morgan does contend that Fiorentino and Hill should have made explicit, prior to his termination, the "asserted justifications set forth in his termination letter: that 'non-matriculated minors may enroll' in his 100-level courses and his involvement in a one-day program for high school students." (Doc. 48 at 13). According to Morgan, in failing to do so, "Defendants failed to provide Morgan 'the substance of the relevant supporting evidence" against him, (Doc. 48 at 13), and, construing Morgan's arguments liberally, Fiorentino and Hill should have known that terminating him as a result thereof violated his "clearly established" procedural due process rights. (Doc. 48 at 13 (citing *Fraternal Order of Police, Lodge No. 5 v. Tucker*, 868 F.2d 74 (3d Cir. 1989)).

While we understand Morgan's efforts to extend *Tucker*, its application to the case *sub judice* is misguided. In *Tucker*, several police officers challenged the Police Commissioner's decision to suspend/dismiss them as a result of refusing to complete a drug screening. The Third Circuit affirmed the district court's finding that the officers' procedural due process rights had been violated when "they were

not told anything specific about the drug use allegations being investigated or the evidence regarding this drug use allegation." *Tucker*, 868 F.2d at 80. The Third Circuit noted that, "[w]ithout this information plaintiffs and their attorneys, even assuming they were afforded the opportunity to tell plaintiffs' side of the story, had no opportunity to explain or rebut the evidence giving rise to the 'reasonable suspicion' of on-duty drug use." *Id*. Thus, the Third Circuit held that an employer's failure to identify specific evidence against an employee deprived the employee of a meaningful opportunity to respond in derogation of that employee's procedural due process rights. *Tucker*, 868 F.2d at 80. However, according to the Third Circuit, this stood in contrast to *Gniotek v. City of Philadelphia*, 808 F.2d 241 (3d Cir. 1986) and *Copeland v. Philadelphia Police Dep't*, 840 F.2d 1139 (3d Cir. 1988) wherein no constitutional deprivation occurred when the employee was notified of the charges again him and given an opportunity to make a statement. Although the Third Circuit highlighted that an employer cannot withhold evidence and then insist that the employee had a full opportunity to respond, the Third Circuit did not find—as Morgan asks us to do in this case—that every detail concerning the employer's rationale for termination must be disclosed lest the employer violate procedural due process. In this case, Morgan has not alleged that Fiorentino and Hill withheld any evidence. Rather, he seeks to expand *Tucker* to impose a constitutional violation for an employer's failure to also outline, in full,

the potential implications of the evidence against the employee the employer intends to terminate. As before, Morgan asks for too great an inferential leap.

As a final note, we reiterate that the question before this Court is not just whether a constitutional violation occurred, but whether "a reasonable official" would have understood that what he or she was doing was violating Morgan's constitutional rights. *See Anderson*, 483 U.S. at 639–40. In this case, Morgan does not contest that he was provided several opportunities to discuss the results of his background check. The obligation to disclose evidence prior to termination outlined in *Tucker* does not suggest that "in the light of pre-existing law," the unlawfulness of Morgan's pre-deprivation proceedings should have been apparent to Fiorentino and Hill.

In sum, while we are sympathetic to Morgan's cause inasmuch as we believe that our criminal justice is predicated upon the notion that previously-incarcerated individuals that are said to have been rehabilitated should not be followed by their misdeeds for life, we caution that a § 1983 claim is not the proper procedural mechanism for relief in this instance. Here, Defendants have plainly carried their burden to demonstrate that a reasonable official in Fiorentino's or Hill's shoes could not reasonably have known that terminating Morgan violated his "clearly established" constitutional rights. Thus, Defendants have shown that they are entitled to summary judgment as a matter of law. Accordingly, we shall grant

Defendants' motion for summary judgment as to Morgan's § 1983 claims as outlined in Counts I, II, III, IV, and V.

### b. Counts VI, VIII, X – Gender Discrimination Claim under Title IV, Title IX, and PHRA

Defendants also aver that they are entitled to summary judgment as to Morgan's gender-discrimination claims outlined in Counts VI, VIII, and X because Morgan has failed to show that he was terminated under circumstances leading to an inference of unlawful discrimination. Specifically, Defendants contend, "[t]here is no evidence from which a fact-finder could conclude that Dr. Morgan's termination was connected to his gender." (Doc. 41 at 27). Moreover, Defendants aver, even if Morgan could establish a *prima facie* case for discrimination, he cannot demonstrate that the legitimate, non-discriminatory reasons for his termination were pretextual. That is, that he was terminated for any reason other than those otherwise proposed by Fiorentino and Hill.

In response, Morgan argues that Defendants' decision to terminate him "reflected an irrational bias that as a male he had a permanent predatory nature." (Doc. 48 at 27). Thus, Morgan extrapolates, "[t]his prejudice ties into a strong prevailing stereotype that men are more apt than women to be sexual predators." (*Id*. at 27–28). In turn, Morgan concludes, because other circuits have held that "the use of negative male stereotypes in employment decisions is discriminatory," a reasonable person could conclude that Morgan was terminated as a result of a

negative male stereotype and the issue must be presented to the jury. (*Id.* (citing *Oakstone v. Postmaster Gen*., 332 F.Supp.2d 261 (D. Me. 2004)). We disagree.

"The existence of a *prima facie* case of employment discrimination is a question of law that must be decided by the Court." *Sarullo v. U.S. Postal Serv*., 352 F.3d 789, 797 (3d Cir. 2003). The elements of employment discrimination include: (1) that the plaintiff belongs to a protected class; (2) that he or she was qualified for the position; (3) that he or she was subject to an adverse employment action despite being qualified; and (4) that the adverse employment action was incurred under circumstances that raise an inference of discrimination. *Id.* Accordingly, to support a claim of employment discrimination, a claimant "must establish some causal nexus between his membership in a protected class and the" adverse employment action alleged. *Id.* at 798. The absence of any evidence—aside from a plaintiff's own conclusory suspicions—suggesting some discriminatory explanation for the adverse employment action alleged is fatal. *See id.* at 799.

In this case, aside from his own conclusory allegations that he was terminated as a result of gender-stereotyping, Morgan has not pointed to anything in the record establishing any causal connection between his gender and his termination. Thus, Morgan has failed entirely to identify any facts in support of his view that the circumstances of his termination raise an inference of

discriminatory action. As Defendants note, Morgan's termination was "a unique situation." (Doc. 41 at 29). "No other faculty members were convicted of felony sexual abuse of a minor child." (*Id.*). Indeed, Morgan does not contend that LHU staff called him names or made off-hand remarks suggesting he was, or would be, terminated as a result of his gender. Nor has Morgan proffered anything suggesting that other similarly situated female employees were treated differently. Thus, we find that Morgan has failed entirely to demonstrate that the circumstances of his termination raise an inference of discrimination. Accordingly, Defendants are entitled to summary judgment as a matter of law as to Count VI.

For the same reason, we find that Defendants are entitled to summary judgment as to Plaintiff's discrimination claim under Title IX in Count VIII and under the PHRA in Count X. As Defendants note, PHRA claims and Title VII claims can be interpreted together and are treated co-extensively. *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996). Likewise, because Title IX jurisprudence mirrors that of Title VII, courts have found that if a plaintiff's Title VII claim fails, that plaintiff's claim brought based upon the same facts under Title IX also fails. *See Summy-Long v. Pennsylvania State Univ.*, 226 F. Supp. 3d 371, 411 (M.D. Pa. 2016), *aff'd*, 715 F. App'x 179 (3d Cir. 2017). Thus, for the same reasons Defendants are entitled to summary judgment as to Morgan's Title VII claim, they

are also entitled to summary judgment as to his discrimination claims under Title IX in Count VIII and under the PHRA in Count X.

### c. Counts VII, IX, XI – Hostile Work Environment Claims Under Title VII, Title IX, and the PHRA

Defendants also argue that Morgan's hostile work environment as outlined in Counts VII, IX, and XI must fail. Specifically, Defendants argue, Morgan cannot use a discrete event like his termination as the basis for a hostile work environment claim. (Doc. 41 at 32 ("A hostile work environment 'cannot be said to occur on any particular day.'") (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)). Likewise, Defendants continue, by relying upon his termination and events resulting therefrom, Morgan has failed to demonstrate that the conditions of his *employment* were sufficiently "severe or pervasive." According to Defendants, the very essence of a hostile work environment claim is that the hostility occurred while the plaintiff was employed, and, thus, Morgan's reliance upon events after his employment ended is misguided. Therefore, Defendants conclude, Morgan has failed to demonstrate a basis for his hostile work environment claim under Title VII, the PHRA, and Title IX, and they are entitled to summary judgment as a matter of law as to counts VII, IX, and XI.

In response, Morgan argues that he has shown that he was "excluded" from the workplace which, in his view, is sufficient to support a hostile work environment claim. (Doc. 48 at 34). According to Morgan, after his termination,

he was excluded from campus, he was not asked to publish or edit scholarly journals, and his colleagues were distant. Thus, Morgan concludes, when viewed in relation to the surrounding circumstances, "[a] jury could conclude that the ostracism from colleagues and profession was part of a wider animus, destruction, and stigmatization," and summary judgment is thus inappropriate. (*Id*. at 36). We disagree.

> Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Such claims are based on the cumulative effect of individual acts.

*Nat'l R.R. Passenger Corp.*, 536 U.S. at 115 (internal citations omitted). In this case, Morgan contends that he was terminated—a discrete act—and that, as a result thereof, he was subsequently "ostracized" from work. As our Supreme Court has noted, the discrete act of Morgan's termination cannot, in and of itself, serve as the basis of Morgan's hostile work environment claim. *See Nat'l R.R. Passenger Corp.*, 536 U.S. at 115. Thus, Morgan necessarily relies upon events following his termination in support of his claim. However, presupposing the notion of a hostile work environment is the understanding that the hostile conditions at issue are in some way connected to one's work. It would defy logic to find that Morgan had been subject to a hostile work environment as a result of conduct that took place

after he had been terminated and was no longer expected to come in. While we appreciate Morgan's effort to analogize his termination and its aftermath to a situation in which an employee has been constructively excluded from the workplace as a result of co-worker ostracism, Morgan's efforts to bootstrap an otherwise meritless hostile work environment claim based upon the discrete act of his termination is misplaced. Accordingly, summary judgment shall be granted to Defendants as to Counts VII, IX, and XI. *See Kelly*, 94 F.3d at 105; *Summy-Long*, 226 F. Supp. 3d at 411.

### d. Morgan's Cross-Motion

In closing, we resolve the arguments Morgan raises in his cross-motion. (Doc. 34). First, Morgan contends that, because, in his view, the instant action rests upon the erroneous application of the CPSL and because the Commonwealth Court and the arbitrator found that Morgan's "termination infringed upon his substantive due process rights," (Doc. 36 at 10 (citing *PASSHE*, 193 A.3d at 503)), the "Commonwealth Court's determination that Morgan's termination was not required by the CPSL and was in violation of his due process rights must be given preclusive effect." (*Id*. at 8). In the same vein, Morgan continues, because the arbitrator found that terminating Morgan as a result of his conviction resulted in duplicative punishment for his 1989 crime, (*id*. at 17), the arbitrator's decision must be given preclusive effect as to whether Fiorentino and Hill violated the Ex

Post Facto Clause.  Third, Morgan contends, because his arbitration award resulted from his collective bargaining agreement—an otherwise valid and enforceable contract with the Commonwealth of Pennsylvania—"[t]his Court must give full faith to the favorable arbitration award and grant partial summary judgment in" his favor as a result of our Constitution's Contract Clause.  (*Id*. at 19).  Finally, based upon the aforementioned, Morgan concludes that he is entitled to summary judgment as a matter of law as to all counts in his amended complaint and that proceedings should continue as to only damages.  (*Id*. at 20).  Although Morgan makes several accurate and well-supported assertions, his conclusions resulting therefrom are tortured and borderline impertinent.

To begin, we reiterate that the question before this Court as it concerns Morgan's constitutional rights—including his substantive and procedural due process rights as well as his right against the *ex post facto* application of law—is not simply whether his rights were violated, but whether "a reasonable official" would have understood that what he or she was doing was violating those constitutional rights.  *See Anderson*, 483 U.S. at 639–40.  Thus, for the reasons discussed *supra*, even were we inclined to give preclusive effect to the arbitrator's and the Commonwealth Court's findings and holding—which we decline to do at this juncture—those facts and issues would not be dispositive of the questions

27

before this Court as it pertains to Morgan's right to recover under § 1983 for asserted constitutional violations.

Moreover, we agree with Morgan that he is certainly entitled to the enforcement of his lawfully-obtained and supported arbitration award. However, Morgan's conclusions that "[n]ot granting relief . . . would cause negation of the" collective bargaining agreement in violation of the Contracts Clause, (Doc. 36 at 18), and that "[t]his Court must give full faith to the favorable arbitration" and, therefore, "grant partial summary judgment in favor of Morgan" does not follow from the legally-accurate statement that his collective bargaining agreement is a contract. (*Id*. at 19).

We note that Morgan does not raise a constitutional claim under the Contracts Clause in his amended complaint. This is important because it is clear that the Contracts Clause is simply inapplicable to the case *sub judice*. "A federal cause of action is stated under the contract clause when one alleges that he or she has a contract with the state, which the state, through its legislative authority, has attempted to impair." *Univ. of Hawai'i Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1101 (9th Cir. 1999). Thus, it is not clear whom Morgan asserts is using its legislative authority to impair his lawful contract with the Commonwealth. Defendants are not challenging the validity of Morgan's favorable arbitration award or the collective bargaining agreement, they are simply defending against a

private cause action filed by Morgan against them. Nor has the Commonwealth of Pennsylvania been sued in its legislative capacity, nor has Morgan alleged that Defendants have inserted themselves into the legislative process in any way. From what we can gather, Morgan must be arguing that, if this Court refuses to grant summary judgment in his favor, *we* would effectively negate the arbitration award issued in Morgan's favor and, in so doing, *we* would be impairing his otherwise enforceable contract with the Commonwealth. In other words, Morgan asserts that his win before the arbitrator means he necessarily must win before this Court and that if we refuse to grant him relief then *we* would be impairing his contractual rights in violation of the Contract Clause. Because we refuse to believe that a litigant would argue that the Court itself is violating that litigant's constitutional rights by refusing to rule in his or her favor we do not address Morgan's arguments concerning the Contracts Clause other than to say that it is simply inapplicable. To the extent Morgan's argument could be construed as simply reinforcing his view that his arbitration award and the Commonwealth Court's decision should be given preclusive effect, we are unconvinced for the reasons discussed *supra*.

Accordingly, Morgan's motion for summary judgment shall be denied.

## IV.    CONCLUSION

For the aforementioned reasons, Plaintiff's motion for summary judgment, (Doc. 34), shall be denied and Defendants' motion for summary judgment, (Doc. 38), shall be granted. An appropriate Order shall issue.